Tennyson v. Illinois Steel Co., 168 Ill. App. 95.

---

Agnes Tennyson, Administratrix, Appellee, v. Illinois Steel Company, Appellant.

Gen. No. 5517.

1. Verdicts—*when not disturbed in personal injury case.* In an action for personal injuries the verdict rendered will not be disturbed if no errors of law have intervened and the evidence tends to establish the averments of the declaration which is sufficient in law to sustain the verdict.

2. Appeals and errors—*when admission of erroneous evidence*

*will not reverse.* The admission of erroneous evidence will not reverse if no prejudice appears to have resulted.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Will county; the Hon. CHARLES B. CAMP-BELL. Judge, presiding. Heard in this court at the April term, 1911. Affirmed. Opinion filed November 23, 1911. Rehearing denied April 11, 1912. *Certiorari* denied by Supreme Court (making opinion final).

JOHN R. COCHRAN and GARNSEY, WOOD & LENNON, for appellant; KNAPP & CAMPBELL and JOHN C. MECHEM, of counsel.

BARR, McNAUGHTON & BARR, for appellee.

OPINION PER CURIAM. At 7:30 or 7:45 P. M. of March 27, 1909, there was a "bosh slip" in blast furnace No. 1 of the Illinois Steel Company's plant at Joliet, and three or four minutes later there was a very serious explosion in the engine room, about 400 feet distant, connected with said blast furnace, the roof and walls were largely destroyed and much other damage was done, and James Tennyson, the engineer on duty there, was killed. His administratrix brought this suit against the Illinois Steel Company to recover damages to the next of kin resulting from his death, which the declaration attributed to the negligence of the company. There was a plea of not guilty, a jury trial, a verdict for plaintiff for $10,000 and a judgment thereon, from which the defendant below appeals.

The declaration will be better understood by a preliminary statement of the machinery, appliances and method of work involved in this explosion, though these are so technical and intricate that our description must necessarily be incomplete. The record shows that blast furnace No. 1 is shaped much like an ordinary lamp chimney and is over 80 feet high; that it is lined inside with fire brick; that its internal diameter at the top is 15 feet, from which it gradually

widens as it goes down until at about 23 feet from the bottom it is 20 feet wide, and that from there it contracts to a distance of about 10 feet from the bottom, at which point it is 13 feet in width, and so continues from there to the bottom. The widest part is called "the bosh" and the bottom is called "the hearth." A short distance below the top of the furnace and within it, is a bell shaped stopper which can be raised and lowered a distance of 2 or 3 feet. When raised, the outer rim of the bell fits against a projection or flange around the inside of the furnace wall and closes the top of the furnace. Just below the edge of the bell are some outlets to the side, one of which is called the "down-comer," which is a pipe about 6 feet in diameter which conveys the gas generated in smelting from the top of the furnace to different parts of the works where it is used for fuel. If the pressure of the gas at the top becomes excessive, valves open automatically just below the bell into other pipes called "bleeders" through which the excess escapes into the open air. About in line with the bleeders were "explosion doors" originally put in to aid in the escape of gas and other material when there is a slip. About 10 or 12 feet from the bottom of the furnace an iron pipe, called a "bustle pipe," with 3 feet internal diameter, lined with fire brick, encircles the furnace. From the bustle pipe small pipes run to nine openings through the furnace walls, called "tuyeres," and through the tuyeres air at a temperature of about 800 degrees is forced into the furnace under a pressure of 10 pounds to the square inch when the furnace is being operated. The other appliances connected with the furnace are the engine for forcing cold air through structures called "stoves," which heat it to a temperature of 800 or 900 degrees Fahrenheit, or higher, and it is then forced into the furnace.

There are four stoves between the engines and the

furnace to heat the air. Three of the stoves are in a row immediately south of the furnace and one is a short distance west of the furnace. The stove farthest from the furnace is about 150 feet south of it. Each stove is about 80 feet high and 20 feet in diameter, and is lined with fire brick, and has two 'partitions of firebrick, one extending from the bottom to near the top, and the other from the top near to the bottom. The stoves are heated by gas taken from the top of the furnace by the down-comer, which gas is conveyed by a pipe to the bottom of the stove into which it is admitted with a proper mixture of air to cause it to burn. A stove is heated by the heat from the burning gas traversing the three chambers of the stove, from the bottom up one side, then over the partition and down the center chamber, then under the other partition and up the other side, and out into the open air through a stack. It takes three hours to heat a stove and three stoves are being heated at the same time, while the fourth is being used to heat the air for the furnace. The air for the furnace is heated by shutting the inlet for the gas and the outlet at the stack, and opening a valve from the cold air pipe into the top of the stove, and forcing the air into the chamber of the stove at the top on the side the heat traversed last, and then, through the stove which had been heated, in the opposite direction to that in which the heat traversed the stove, and out of the stove through a valve into a pipe 150 feet long, which is lined with fire brick and is about 3 feet inside diameter. This is called the "hot blast main," and through it the heated air from the stove is forced into the bustle pipe and thence through the tuyeres into the furnace. The air when forced through a stove is heated to 800 or 900 degrees or higher, and in the course of an hour the stove cools so that it does not heat the air as at first, and then another stove which has been heated is connected with the cold air pipe and the hot blast

main, and the cold stove is shut off from the hot blast main and the cold air pipe and is connected with the gas main to be again heated.

The engines for pumping the air are situated in a building about 400 feet south of the furnace. The air is sucked into the blowing pipes by the engines and forced past certain valves into a cold blast main about 3 feet in diameter. The cold blast main, raised a few feet above the ground, leads to the first stove, where the air ascends to the top of the stoves and over them. There are valves at the top of the stoves for shutting off the air from or admitting it to each of them. The cold blast main, the stove and the hot blast main, make one continuous main when the air is passing through the stove from the engines to the furnace, and the air is forced into the furnace under a pressure of 10 pounds to the square inch, as this furnace requires 33,000 cubic feet of air per minute.

It is necessary for the successful management of a furnace that the air forced into it through the tuyeres shall be of a uniform temperature. When a stove after being heated, is first connected with the air course, it heats the air more than it will after it has been cooled by the air passing through it. To keep the hot air at a uniform temperature in the hot blast main a smaller main connects the cold air main at the top of the stoves with the hot blast main between the stoves and the furnace. In this connecting main is a valve called "the mixer valve," by which cold air may be admitted in any amount required from the cold air main without passing through a stove, and so may lower the temperature of the air in the hot blast main when a fresh stove is connected with it. The amount of cold air admitted is gradually diminished while a stove is being used, thus keeping the heat of the air at a uniform temperature of about 800 degrees in the bustle pipe during the entire hour each stove is successively used. There are various valves

in the mains near the engines, in the cold air main just after it turns to ascend to the top of the stoves, and in the hot blast main, to keep the air pressure uniform or to cut it off, and means for ascertaining the heat in furnace, bustle pipes and elsewhere, which it is not necessary to describe.

In operating the furnace a certain amount of ore with proper proportions of coke, limestone, scrap and sometimes flue dust, is at intervals of about 15 minutes placed on the bell at the top of the furnace; the bell is then lowered a short distance and the raw material slides off the bell into the furnace, after which the bell is raised and closes the top of the furnace. The furnace is kept filled with material up to within about 15 feet of the top and, when filled, contains about 800 tons of material, which is called the "burden." The temperature at the top of the furnace is about 500 degrees. As the smelting proceeds the burden descends in the furnace and the heat increases to about 3,000 degrees at the bosh, or "fusion zone," so that the ore in that place is in a spongy state, and at the bottom of the bosh the iron is liquid and drips to the hearth; the coke is consumed and the limestone mixes with the impurities of the ore, forming slag, which floats on the top of the molten metal and is drawn off whenever it reaches a certain height on the hearth, through an opening called the "cinder notch" a short distance above the opening where the molten iron is run out, which latter is called the "iron notch."

The theory of the working of a blast furnace contemplates that the material will gradually and uniformly sink toward the bottom. In practice it does not always settle uniformly but the material sticks or hangs to the wall of the furnace, and this produces a condition called "hanging." When this condition occurs, there is a space in the furnace between the part of the material that sinks and "the hang" which

is filled with gas. This condition necessitates an operation called "slipping the furnace," which is so operating the appliances that the hang is forced to move down. When the hang is near the top of the furnace the burden above it is comparatively slight and the slip is light and not particularly dangerous, and that is called a "top slip" but where the hang is at the bosh the burden above it is much greater and the operation of slipping is much more dangerous, and such a slip is called a "bosh slip." A light slip is of frequent occurrence, but a heavy bosh slip is rare and a serious matter. Any slip forces gas out of the furnace to some extent. When gas mingles with air in certain proportions an explosion will follow. That there is a hang in the furnace is usually discovered by the top charger. In the top of the furnace are four holes called "try holes" each about an inch and a half in diameter, and it is the duty of the charger to run a rod down through these holes after the charge has been put in the furnace, to determine whether the burden is moving properly. For this purpose rods of different lengths are provided and used. The fact that a furnace is hanging may sometimes be discovered by the foreman in charge of the furnace by an examination of the condition of the furnace through peep holes which are in the back of the blowpipes or tuyeres. If the charger discovers that the furnace is hanging, it is his duty to notify the foreman by blowing a whistle. If a hang occurs more than an hour and a quarter after the metal has been run out of the furnace, or, as otherwise expressed, after the furnace has been "cast" then the foreman must ascertain if there is slag or cinder in the furnace that would be splashed into the tuyeres by the fall of the hang, and if he finds that material present he must draw it off through the cinder notch. He must also examine the furnace through the peep holes. It is then the duty of the foreman to signal the men about the furnace

and in the engine room, by blowing whistles, that he is about to force a slip. In front of the furnace is a Bristol recording pressure gauge, which indicates what air pressure is on at the furnace at all times. The signal that a slip is about to be forced is notice to the engineer to slacken the speed of the engine and lower the pressure. The pressure is also lowered by opening a relief valve in the cold air main south of the stoves, which permits the cold air to escape before it gets to the stove. The burden sometimes slips by simply taking off the air pressure, which when on tends to hold up the burden. As soon as the foreman ascertains that the burden is beginning to slip, it is his duty to notify the engineer to restore the air pressure.

The declaration consisted of one original and eleven additional counts, and is of very great length, and is very full of details of the conditions and facts creating the duties set up in the several counts, which, it is alleged, the company negligently violated. It covers over 40 pages of the record, and can be only very briefly summarized here. The original count charged that appellant so negligently constructed, maintained, used, managed and operated said blast furnace, stoves, boilers, engines and other equipment and attachments, used with said blast furnace, that thereby a large volume of gas, generated in said furnace, was permitted to escape through a certain duct, pipe and equipment, connected with said furnace, to the engine room in which plaintiff's intestate was at work, and said gas to explode, causing large quantities of iron and other material to be thrown against said intestate, and causing his death. The additional counts will be referred to by their number. The first count described the slip and the connections between the furnace and the engine room, and charged that defendant negligently installed and maintained in a certain air pipe a valve, so inadequate and insufficient in design,

Tennyson v. Illinois Steel Co., 168 Ill. App. 95.

construction and repair as to be worthless in prevent-
ing gases, generated in said blast furnace, from being
forced out of the furnace and into and through said
pipe and into said engine room, where plaintiff's in-
testate was at work, whereby said furnace slipped
and forced large volumes of gas through the air pipes
and stoves and into the engine room, where it exploded
and killed plaintiff's intestate.   The second count
charged that appellant negligently failed to construct
and maintain in said air pipe valves or explosion
doors of such design and capacity that, in the event
of a slip in the furnace and a forcing of the gases
back through said pipe towards said engine room,
said gases would escape through such valves, explosion
doors or other devices, into the open air, and thereby
prevent the escape of said gases into said engine
room; and thereby, when said furnace slipped, gases
were forced through said pipe into said engine room
and ignited and exploded, etc.   The third count
charged that appellant so negligently operated said
blast furnace that the material therein was caused to
slip a great distance and thereby large quantities of
gas were forced from said blast furnace along said
air pipe into said engine room and there ignited and
exploded.   The fourth count charged that appellant
so carelessly constructed and operated said blast fur-
nace, stoves, boilers, engines, gas pipes, air pipes,
blowers and other attachments that in consequence
of such negligence great quantities of gas generated
in said furnace were forced along said pipe into said
engine room and there ignited and exploded.   The
fifth count alleged that a slip in the furnace would
cause the gases generated therein to be forced out of
the furnace and towards said engine room, and that
appellant had installed a valve in said pipe to prevent
the gases from being forced back into said engine room
when a slip occurred; that a valve which would operate
automatically, and the maintenance of the same in

good repair and condition, was necessary to the operation of said blast furnace in a manner reasonably safe for the employes of appellant in said engine room; and that appellant negligently failed to construct, maintain and keep in repair an automatic valve to prevent the gases so generated from being forced from said air pipe into the engine room; and that by reason of said negligence the slip forced the gases through said air pipe into the engine room where it ignited and exploded and killed plaintiff's intestate. The sixth count charged the duty of appellant to exercise ordinary care to cause the raw material in the furnace to sink with regularity and uniformity and to prevent said raw material from hanging therein for a long and unreasonable time while the furnace was in operation; and that appellant negligently permitted said furnace to be operated for the space of, to-wit, six hours during all which time the raw material in said blast furnace was permitted to hang stationary therein, thereby permitting a heavy and dangerous slip of said raw material, to-wit, 400 tons thereof, to take place in said furnace for a distance of to-wit, 30 feet, thereby causing large quantities of gas from said furnace to be forced back through said air pipe into said engine room and to there escape and to fill said engine room and to become ignited and to explode, whereby plaintiff's intestate was killed. The seventh count charged the duty of appellant in the construction, maintenance, operation and repair of said blast furnace to install, maintain and keep in repair in said furnace explosion doors, bleeders and other like devices to carry off surplus gases generated in said furnace in the event of a slip therein, and that appellant negligently failed to perform this duty and thereby the slip forced said gases into the engine room where they exploded and killed plaintiff's intestate. The eighth count charged that the construction, and operation of the blast furnace and equip-

ment in a manner reasonably safe for employes in the engine room required that automatic valves be installed and maintained at all openings in the blast furnace connected with said air pipe, so adjusted and maintained as to close said openings whenever a slip occurred, thereby preventing the gas from being forced into the engine room; and that appellant negligently failed to install and maintain in such blast furnace such automatic valves or other like device, and in consequence of such neglect, when the slip occurred, the gas was forced from the furnace into the engine room. The ninth count charged at great length that there were certain proper proportions of iron ore, coke, limestone, scrap, steel and flux, which would settle down in the blast furnace with regularity and uniformity, while with improper proportions thereof the same would not settle with regularity and uniformity, but would clog, stick or hang in the furnace until a great quantity of the stock in the lower part of the furnace was consumed and created a great void between the bottom of the stock which was hanging and the top of the molten metal at the bottom of the furnace, which void would continue to grow greater while said upper portions of the material were hanging, and when said upper material fell towards the bottom, it would do so with great force and violence and would cause the gases generated in the furnace to be forced out of the furnace through said air pipe and into said engine room and thereby subject the workmen in the engine room to great and unnecessary danger, and that appellant negligently failed to supply said blast furnace with a sufficient quantity of coke and flux in proportion to the other materials used therein, whereby the stock was permitted to hang for a period of, to-wit, six hours, and thereafter to slip with great force down upon the volume of gases so generated, and thereby caused large volumes of said gases to be forced back through the air pipe and stoves into said

engine room, where said gases ignited and exploded and killed plaintiff's intestate. The tenth count was similar to the ninth, but alleged that appellant negligently attempted to reduce said iron ore in said furnace by the use of an insufficient quantity of coke and flux, thereby causing the furnace to hang and thereafter to slip and fall a distance of, to-wit, 40 feet, down upon the gas generated in the furnace and thereby forced the gas into the engine room, etc. The eleventh count described at great length the blast furnace and the methods of its operation and that to operate the same in a manner reasonably safe it was necessary to cause the furnace to be slipped at short intervals, and it described at length the manner in which it should have been slipped, and that the manner in which the slip was conducted was exceedingly hazardous and dangerous; and described in detail wherein the manner of this slip was negligent, and its result in forcing said gas into the engine room, and the death of plaintiff's intestate therefrom. The declaration duly charged that plaintiff's intestate was in the employ of appellant and was in the exercise of due care, and that appellant had knowledge of the various conditions described and of the danger and of its duty, or should have had knowledge thereof by the use of due care. The names of the next of kin and the loss to them were properly stated.

Appellant introduced evidence tending to show that the furnace and the other appliances were all in good order and condition, and were the best approved methods and appliances for reducing iron ore known to the business, and that the furnace was conducted with due care and the slip properly managed, and that the slip and the explosion were a pure accident, occurring without any negligence on the part of appellant, and that it was a risk which plaintiff's intestate assumed. If there had been a verdict and a judgment

for the defendant, it could not have been disturbed in this court upon this evidence.

But there is other evidence which might reasonably lead the jury to a different conclusion. The furnace was discovered to be hanging at 6:15 P. M. and, after one unsuccessful attempt, a slip was finally produced at about 7:45 P. M. Appellant claims that it was not hanging before 6:15 P. M. and that from that time on it took the usual means to produce a slip. The evidence leaves it by no means certain that the hanging began at 6:15 P. M. Immediately after the slip the top charger measured with one of his rods and found that the burden had fallen 14 feet. The proof shows that when the furnace is moving with uniformity a burden of 800 tons, as this was, will sink 56 feet in 12 hours. If the material in the furnace below the hang moved as rapidly after the hanging began as before, it would take four hours for a void of 14 feet to be produced underneath the hang. But the weight of the burden having been taken off by the hang the jury might well conclude that the material beneath would sink less rapidly than usual. The jury therefore might conclude from the evidence that the burden had been hanging three hours or more before the slip at 7:45 P. M. or that it was hanging before five o'clock. This leads us to inquire what supervision this furnace had between five o'clock and 6:15 when the hanging was discovered. The superintendent left the plant at 5:30 and examined furnace ·No. 1 some time before he left. The assistant superintendent was out of town from the middle of the afternoon. The general foreman of blast furnaces 1, 2, 3, and 4, after No. 1 was cast at five o'clock, that is, after the molten metal was drawn out of the iron notch, made an examination of No. 1 around the bottom of the furnace about 5:15. He then examined furnaces 2, 3, and 4, examining No. 4 last, and went to the office and left the plant about 5:45 P. M. The general foreman at night went

on duty at 6 P. M. and apparently did not exercise any supervision over No. 1 at first but went to furnaces Nos. 3 and 4 and there heard about 6:45 P. M. that No. 1 was hanging. He then went to No. 1 and told the night foreman of furnaces Nos. 1 and 2 to keep after No. 1 which obviously meant to keep on trying to produce a slip, and the general foreman then went to a telephone to talk with the superintendent and did talk with him about this and another furnace till the slip occurred. The day foreman of furnaces 1 and 2 testified that they cast No. 1 at five o'clock and that right after that he looked around and found no indication that the furnace was hanging and left at ten minutes to six. The night foreman of furnaces 1 and 2 testified that he went on at six and cast No. 2 furnace right after six and was at No. 2 furnace at 6:30 P. M. when the whistle blew to show that No. 1 was hanging. He had evidently done nothing at furnace No. 1 before that, and after that he gave orders below. The hot blast man on the day turn on furnaces 1 and 2 quit at six o'clock, and apparently did nothing concerning furnace No. 1 after it was cast at five o'clock. The night hot blast man on Nos. 1 and 2 went on duty at six P. M., examined the heat in the lower part of the furnaces at No. 1 and then went to No. 2 and was there till he heard the signal that No. 1 was hanging. The hot blast helper at Nos. 1 and 2 on the night turn went on at 6 P. M. and after a little work at No. 1, went to No. 2 and worked there till the signal was given that No. 1 was hanging. These two men on the night turn, the hot blast man and his helper, were each about 19 years of age and had spent but a few months at this furnace or at this kind of work. The boss top filler on No. 1 that night went on duty at 5:50 P. M. At 6 he put down one of his rods through one of the holes in the top of the furnace provided for that purpose, and then put on another charge, and then put down his rod again at 6:15

and then found that the burden had not descended since his previous measurement and therefrom decided that the furnace was hanging. It is claimed from his evidence that he meant that it was not hanging at six o'clock when he first measured, but it is evident from his testimony that he could not tell whether it was hanging till he made a second measurement and compared it with the first. The evidence shows that the man below could form some judgment whether the burden was hanging by looking through the peep holes at the tuyeres and also by ascertaining the amount of heat below. But the only sure test whether the furnace was hanging was the use of the rods at the top. There was no proof of the use of any rod at the top of No. 1 between five and six P. M. and therefore no positive proof that the furnace had not been hanging since five o'clock at least. Forty-five charges were put into the top of this furnace between 6 A. M. and 6 P. M. that day, or nearly one charge every 15 minutes. The evidence seems to show that these charges weighed about 16 tons each or more. No one testified that charges were put in between five and six P. M. but from the total number of charges that half day and the evidence that regularity and uniformity were constantly observed, the jury might reasonably infer that charges were put on every 15 minutes during that time. If the furnace was hanging all that time, the jury might well conclude that it was negligence to add 16 tons every 15 minutes to the hanging burden. This evidence therefore tends to show that from five to six P. M. this furnace did not have proper attention. Again, when the slip was finally produced a charge was resting on top of the bell, and immediately after the slip and before the explosion the top charger lowered the bell and discharged that additional weight of 16 tons upon the contents of the furnace, with a fall of 14 feet or more, thereby greatly increasing the pressure which forced the gas through the mains into

the engine room, where its mixture with air produced the explosion. The jury may have concluded that it was the fall of that great weight at that instant which forced the gas into the engine room and produced the explosion which occurred three or four minutes after the slip. Again, explosion doors had been provided near the top of the furnace, and these had been bolted down, on the theory that the bleeders furnished a sufficient outlet in that direction for the gas at the time of the slip, and because men had been overcome by gas when they went to close the explosion doors after a slip. The proof is that when the burden slips it usually breaks up to some extent, and cracks open in the material, through which cracks some of the gas below the burden escapes upward to the top of the furnace. That there were such cracks produced when this burden slipped is evident from the fact that the force opened the bleeder valves and that the stock came out of the bleeders at the top of the furnace, which could not have happened if the burden had slipped in one solid mass. The jury may have concluded that if these explosion doors had not been bolted down but had been left to operate freely, they would have furnished sufficient relief to prevent the gas from being forced to the engine room. One of the valves at one of the stoves had been fastened by the use of an iron bar, so that it would not act automatically, and this may have deprived the furnace of relief which would otherwise have been afforded.

The evidence makes it clear that before causing the slip it was the imperative duty of the appellant to cause the mixer valve to be closed. One servant of appellant testified that he closed it, and another testified that after the explosion he saw it was closed; and others testified that it was closed, without knowing that fact of their own knowledge. There was, however, evidence from which the jury might conclude that these witnesses were mistaken and that the mixer

valve was not closed. Nearly every other valve connected with these appliances between the furnace and the engine room and in the engine room was broken by the force of the explosion, except the mixer valve. From all the facts and circumstances in evidence the jury may have concluded that the fact that the mixer valve was not broken was the best evidence that it was not closed, and that, if it had been closed, the gases would have gone out through the stove and would have passed into the open air before reaching the engine room.

There was proof introduced by appellee, by at least two witnesses, that the various valves could have been so arranged when it appeared that there was danger of a heavy slip, that the gas would have passed off into the open air without reaching the engine room. Cross-examination by appellant tended to show that such an arrangement would be impracticable, expensive and dangerous to the machinery and to the men about the furnace and stoves, and re-examination tended to confirm the original statement. Appellant has a plant at Gary, Indiana, and there was proof that at the mills there automatic appliances had been installed to prevent gas being forced into the engine room by a heavy slip, and that these appliances were effective, but that they had been discarded because they were not a commercial success. Witnesses testified that they would injure or clog up various apertures about the furnace. The jury may have concluded that in a matter so obviously dangerous as this to the lives of servants, appellant should have adopted those appliances of which it had knowledge, even though its officers regarded them as not a commercial success.

From the evidence which we have partially recited we conclude that the jury might reasonably decide that appellant was guilty of negligence charged in the declaration and that such negligence caused the death of Tennyson.

The assistant superintendent was first called and examined for appellee and was afterwards called and examined for appellant, and on cross-examination by appellee was asked: "Does the engine slack down now to the same pressure that it did at the time of this accident, when a slip is made?" Appellant objected that it was incompetent to show what was done after the accident and that the witness had already answered. This was overruled and appellant excepted and the witness answered that they are not slacked down quite as much. He was then asked: "You maintain a higher pressure?" and he answered "We try to." No objection was interposed to this question. The appellant had contended that to aid in making a slip it was necessary to greatly reduce the speed of the engine in order to reduce the pressure of hot air underneath the burden, and that in this case it became impossible to restore the speed and pressure right after the slip began sufficiently to counteract and overcome the pressure produced by the heavy slip, which forced the gas through the pipes. The tendency of the testimony of this witness in chief was to support the position of appellant. The cross-examiner was seeking to show, contrary to the contention of appellant, that by the use of certain valves the speed of the engine could be maintained and yet the pressure be taken off the furnace while a slip was being produced. The witness had denied this, and the purpose of this question was to call his attention to the manner in which they operated their engines at the present time, as showing that by operating the relief valve the pressure could be reduced though the speed of the engine was not slacked down so much, and his answer tended to show that that was true. But the same thing more complete, was obtained by the next answer, to which no objection was made, and appellant was not harmed. Another witness for appellant was asked by appellee on cross-examination: "Were you there when Mr.

O'Brien was killed in the engine room?" Appellant objected, the objection was overruled, appellant excepted and the witness answered: "No, sir, I was not at that furnace." The court refused to permit the inquiry to be carried any further. It was not shown when or how O'Brien was killed, nor was there anything to indicate that it was by an explosion or in the making of a slip or by the negligence of appellant or that he had been a servant of appellant. Perhaps the questions here referred to should not have been asked, but we find in them nothing which injured appellant or which would justify the reversal of a judgment in a case which occupied the attention of the jury for nine days. It is seldom that so little error of law is alleged in so large a record.

The jury awarded $10,000 damages. It is said that this is excessive. Deceased was earning from $49 to $52 every two weeks, or over $1,200 per year. He was in excellent health and was 42 years old at the time of his death. He left a widow and four children, the oldest aged 8 years and the youngest 7 weeks. This suit is brought to recover damages for their pecuniary loss. We cannot say that their loss does not equal the amount of this verdict.

The judgment is affirmed.

*Affirmed.*